[No. A077974. First Dist., Div. Three. Mar. 31, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK A. KRONCKE, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.C and II.D.

1538

COUNSEL

Patton, Wolan & Boxer and Lawrence A. Boxer for Defendant and Appellany.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias and Linda M. Murphy, Deputy Attorney Generals, for Plaintiff and Respondent.

## OPINION

**PARRILLI, J.**—A jury convicted appellant Mark A. Kroncke of failing to stop and report an auto accident (Veh. Code, §§ 20001, 20003),[1] a felony, and giving false information to a police officer (Veh. Code, § 31), a misdemeanor.

The principal issue is whether sections 20001 and 20003 require that a driver involved in an injury-producing accident identify himself as the driver, when that is not reasonably apparent. As we shall explain, the pertinent sections do impose such a duty. We further conclude that requiring the driver to inform investigating officers that he or she was the driver of a vehicle involved in the accident does not violate the driver's constitutional right against self-incrimination. We affirm the judgment.

---

[1]Subsequent statutory references are to the Vehicle Code, unless otherwise noted.

# I

## FACTS

### Overview

This case arises from the death of Martin Jacobsen, a 21-year-old Danish tourist. According to Kroncke, he met Jacobsen in the early morning hours in San Francisco and offered to drive him to Marin County. Immediately after they drove across the Golden Gate Bridge, Jacobsen suddenly jumped from Kroncke's pickup truck and suffered injuries that were eventually fatal. Kroncke got off at the next freeway exit and returned to where Jacobsen lay on the side of the road. Within a minute, a Golden Gate Bridge officer also arrived at the scene. Kroncke gave his name and other identifying information to the officers at the scene. He also told the officers he was driving on Highway 101 when he spotted Jacobsen on the side of the road and stopped to render aid. In instructing the jury, the court stated that sections 20001 and 20003 impose a duty on a driver to "disclose to the investigating officers that he was the driver of a vehicle involved in the accident, if such involvement is not reasonably apparent." Kroncke contends the pertinent Vehicle Code sections impose no such duty, and the trial court prejudicially erred when it gave the instruction.

### Prosecution Evidence

On September 28, 1995, Danish tourists Martin Jacobsen and his cousin Nikolas Sorensen arrived in San Francisco, where they stayed in a downtown youth hostel. A few days later, Jacobsen told his cousin he was going to the Haight-Ashbury district to sleep with the homeless in the park. At 12:30 a.m. on October 4, Jacobsen left for the Haight with his sleeping bag and a small amount of money. He left his identification and most of his money at the hostel. He told Sorensen he would meet him at the hostel in the afternoon.

About 3:30 a.m., some three hours after Jacobsen left his hostel, a witness saw Jacobsen's body lying against the guard rail in the northbound lane of Highway 101, just before the Waldo tunnel in Marin County. The witness stopped at a turnout before the tunnel and used a call box to summon help. While he was at the call box, the witness saw a pickup truck pull up to Jacobsen's body. A heavyset man—Kroncke—got out of the truck, walked to Jacobsen's body, and shook him. Emergency vehicles arrived at the scene approximately one minute later.

Golden Gate Bridge District Sergeant David Mills was the first officer to arrive at the scene. He saw Kroncke's pickup truck stopped in the slow lane

and Jacobsen lying by the guardrail. Jacobsen was seriously injured and gasping for air. Mills called for an ambulance. Mills did not believe that either Kroncke or his truck was connected to Jacobsen or the accident. Kroncke did not volunteer any information about how Jacobsen came to be on the roadway, nor did he tell Mills he was involved in the incident.

A few minutes later, District Lieutenant Michael Locati arrived at the scene. In response to Locati's questions, Kroncke said he was going northbound when he happened to see Jacobsen lying by the side of the road. Kroncke also said he was a Golden Gate Transit bus driver. Kroncke gave Lieutenant Locati his name and address and Locati wrote down Kroncke's license plate number. Nothing at the scene or in what Kroncke said led Locati to believe Kroncke was connected with Jacobsen or the accident.

Marin County Deputy Sheriff Fred Marziano also stopped at the scene to render assistance. Marziano, who knew Kroncke casually from various professional and social contacts, asked Kroncke if he knew what had happened. Kroncke said he did not know what had happened. He said he was driving up the freeway when he saw a person by the side of the road. There was nothing about the position of Kroncke's pickup or Jacobsen's body that indicated the pickup had struck Jacobsen or that he had fallen from that vehicle.

Jacobsen was taken to Marin General Hospital where the treating doctor determined he had a terminal brain injury. He was placed on life support, but died three days later. At the time he entered the hospital Jacobsen had a .16 percent blood-alcohol level. An autopsy revealed Jacobsen had suffered a "contrecoup" injury, from which the expert opined Jacobsen's head was in motion when he suffered a blunt force trauma.

The prosecution's accident reconstruction expert opined Jacobsen was sitting upright and facing to the rear when he stepped or jumped from a moving vehicle near the .6 mile marker on Highway 101. Jacobsen rolled on the asphalt for about 56 to 84 feet and came to rest 70 feet north of the .6 mile marker.

More than three weeks after the accident, on October 31, 1995, Marin County Sheriff Detective Jeff Carroll interviewed Kroncke in connection with Jacobsen's death. Kroncke told Carroll he had been in San Francisco early on the morning of October 4, and was driving back home to Marin County when he came across a body on the right shoulder of the roadway. Kroncke stopped to render aid and noted Jacobsen's pupils were "blown," which indicated to Kroncke that Jacobsen had suffered a head injury. Carroll

asked Kroncke if he had ever seen the injured person before. Kroncke responded he did not recognize the person and had never seen him before.

Three days later, Kroncke contacted Detective Carroll and said he wanted to give an additional statement. In a tape-recorded interview, Kroncke admitted Jacobsen had jumped from his truck. Kroncke said he drove to Haight Street in the early morning hours of October 4. There, he saw a person setting trash can fires and helped detain him until the police arrived. Afterwards, he saw Jacobsen ask a police officer for directions to the water. A few minutes later, Kroncke saw Jacobsen near Cala Foods with a group of homeless people. Kroncke offered Jacobsen a ride to his hostel, and Jacobsen accepted.

After they drove around a bit, Jacobsen said his hostel was locked until morning and Kroncke asked Jacobsen if he wanted to go Marin for a drink. Jacobsen agreed. After they crossed the Golden Gate Bridge and passed Vista Point, Jacobsen started panicking, and said he wanted to go back to San Francisco. Kroncke said he would turn around and drive him back, but Jacobsen said he wanted to get out. Just north of Vista Point, Jacobsen suddenly opened the passenger door and stepped out of the pickup. Kroncke was traveling at 40 to 45 miles per hour at the time. Kroncke drove through the Waldo tunnel to the Spencer exit. He sat there in shock for "several minutes" before he decided to drive back to look for Jacobsen. When he returned he found Jacobsen lying on the side of the road.

*Defense*

Kroncke testified that on October 4, 1995, it was too hot to sleep and he went for a drive. His intent was to drive toward the Cliff House in San Francisco to get a view of the Mount Vision fire, which was then burning in western Marin County. He eventually ended up in the Haight-Ashbury district where he saw firefighters extinguishing a trash can fire. Kroncke saw a second fire and then saw a man light a third fire. Kroncke detained the man until Officer Ramos arrested him.[2]

While Kroncke was talking with the police, Jacobsen approached Officer Ramos and asked for directions to the water. Ramos suggested Jacobsen take a bus and pointed to a nearby bus stop. As he was leaving the area, Kroncke saw Jacobsen standing near several homeless people in front of Cala Foods. Concluding Jacobsen was "out of his element," Kroncke approached him and asked if he wanted a ride. Jacobsen accepted. Following a brief skirmish with a drug dealer, Jacobsen got into Kroncke's truck.

---

[2]Officer Ramos testified and confirmed that Kroncke had detained an arson suspect on October 4, 1995.

After Jacobsen got into the truck, Kroncke drove out to Land's End where they observed the Mount Vision fire. They then drove through the Marina and North Beach looking for Jacobsen's hostel. Jacobsen could not remember where his hostel was, and Kroncke was unable to find it for him. Jacobsen eventually told Kroncke he had not checked out a key and would not be able to get into the hostel until 6:00 a.m. that morning in any event. Kroncke was not in any hurry because he had the next day off. Eventually they ended up at the Vista Point in San Francisco located at the southern end of the Golden Gate Bridge. There, Kroncke asked Jacobsen if he wanted to go across the Golden Gate Bridge into Marin County. Jacobsen agreed.

As they were driving across the bridge about 45 miles per hour, Kroncke pointed out various landmarks. Jacobsen was talkative at that point. However, after Kroncke crossed the bridge and arrived at a point where the view of San Francisco was cut off, Jacobsen's demeanor changed. Jacobsen demanded that Kroncke stop and let him out. Kroncke explained he could not stop on the freeway, but said he would turn at the next exit (Spencer Avenue) and take Jacobsen back to the city. Jacobsen appeared to be panicking. Suddenly, Kroncke heard the sound of whooshing air, as if Jacobsen had opened the car door. He looked over towards Jacobsen and saw his back as he stepped from the truck. Kroncke was shocked.

Kroncke continued driving, passed two turnouts, and got off at the first exit (Spencer Avenue) where he stayed for a few minutes wondering what to do. Ultimately, he decided to return to the area where Jacobsen had jumped rather than calling for help on a nearby phone. Kroncke returned to that area by the shortest route possible. Kroncke stopped his truck 20 feet from Jacobsen so he could see him in his headlights. Kroncke shook Jacobsen, and noticed blood coming from his nose, and that his eyes were half open but unfocused. Kroncke, who had training as an emergency medical technician, determined Jacobsen's injuries were severe and there was nothing he could do. Kroncke was still in shock at that point.

About 30 seconds later, Sergeant Mills arrived at the scene. A few minutes after Mills arrived, Kroncke voluntarily gave Mills his driver's license and vehicle registration and said, "Here's my info, I'm the driver, and this is the vehicle." Kroncke did not recall having any substantive conversations with any other officer that night. He was in "no shape to talk" and didn't say anything. Kroncke waited until an ambulance took Jacobsen away, and then went home to sleep.

Kroncke denied he was attempting to deceive the officers at the scene. He gave the officers his identification and thought it was fair to assume they

would know he was the driver. Kroncke believed he had identified himself "as being involved in what was going on. . . . [The truck] was the one involved and I am the driver, not just someone who happened along." Given the position of his pickup, Kroncke assumed the officers would reasonably conclude he was connected to the body on the road.

On October 31, when Detective Carroll asked Kroncke if he had seen Jacobsen before, Kroncke answered no because he had not seen him *before the day of the accident.* Kroncke admitted he told Carroll he had been driving northbound on Highway 101 when he saw the body on the side of the road, and that he may have left Carroll with the impression he found Jacobsen on the side of the road. On November 3, after speaking with his brother who is a highway patrol officer, Kroncke decided to speak with Detective Carroll again. Kroncke's motive was "to set the story straight," even though he did not believe he had previously told Carroll anything that was false or inaccurate.

Over defense objection, the court instructed the jury that sections 20001 and 20003 impose a duty on a driver to "disclose to the investigating officers that he was the driver of a vehicle involved in the accident, if such involvement is not reasonably apparent."

The jury returned a verdict finding Kroncke guilty of violating sections 20001 (failure to report an accident) and 31 (giving false information to a police officer.) The court sentenced Kroncke to three years' probation, conditioned on his serving six months in county jail. This timely appeal followed.

## II

### DISCUSSION

A. *The Trial Court Properly Instructed the Jury That Sections 20001 and 20003 Impose a Duty on a Driver to Disclose That He Was the Driver of a Vehicle Involved in an Accident, If Such Involvement Is Not Reasonably Apparent.*

 Kroncke first contends the trial court erred when it instructed the jury he had a statutory duty to disclose to the investigating officers that he was the driver of a vehicle involved in the accident. Kroncke contends sections 20001 and 20003 contain no express requirement to that effect, and therefore the trial court erred when it gave the instruction. We reject this contention.

Section 20001, subdivision (a), provides in pertinent part: "The driver of any vehicle involved in an accident resulting in injury to any person, other

than himself or herself, or in death of any person shall immediately stop the vehicle at the scene of the accident and shall fulfill the requirements of Sections 20003 and 20004." Section 20003, subdivision (a) provides in relevant part: "The driver of any vehicle involved in an accident resulting in injury to or death of any person shall also give his or her name, current residence address, . . . the registration number of the vehicle he or she is driving, and the name and current residence address of the owner to . . . any traffic or police officer at the scene of the accident."

Kroncke correctly points out that the quoted sections do not explicitly impose a requirement that a person identify himself as the driver of a vehicle involved in an injury-producing accident. However, in *People* v. *Monismith* (1969) 1 Cal.App.3d 762 [81 Cal.Rptr. 879] (*Monismith*), the court rejected such a literal interpretation of sections 20001 and 20003, and concluded that to comply with section 20001 the driver must identify himself as the driver of a vehicle involved in the accident, at least where such is not reasonably apparent from the circumstances. In *Monismith*, as here, the defendant was charged with violating sections 20001 and 20003.[3] Although the defendant gave identifying information, he failed to inform the officers at the scene that he was the driver of a car *involved in the accident*. The trial court specifically instructed the jury that the defendant had a duty to " 'identify himself as the driver involved in the accident.' " (1 Cal.App.3d at p. 765.) As Kroncke does here, the defendant argued on appeal that the pertinent sections do not require the driver of a vehicle to report that his vehicle was involved in the accident, but only to give the specific information the sections specify. (*Ibid.*) In rejecting this contention, the *Monismith* court stated:

"[Defendant's] contention flies in the face of the language of both sections 20001 and 20003, since the introductory sentence of each refers to the 'driver of any vehicle involved in an accident resulting in injury.' Clearly, the code sections are concerned not with just a driver and not with just a vehicle, but with the driver of a vehicle *involved in an accident*. [Citations.] While it is true, as defendant argues, a court cannot, by an extension of the language of a statute, make something a crime which the Legislature has not defined as criminal, it is also true that a court, in interpreting legislation of this character, looks at the evil which the statute is designed to remedy.

---

[3]*Monismith* involved an earlier version of section 20003 that read: "The driver of any vehicle involved in an accident resulting in injury to or death of any person shall also give his name, address, the registration number of the vehicle he is driving, the name of the owner, and upon request and if available exhibit his driver's license to the person struck or the driver or occupants of any vehicle collided with or shall give such information and exhibit his license to any traffic or police officer at the scene of the accident. . . ." With respect to the issue presented in this case, we see no substantive difference between the former and current versions of section 20003. (*Monismith, supra,* 1 Cal.App.3d at p. 765.)

Obviously the statute here is designed to prevent the driver of a car involved in an accident from leaving the scene without furnishing information as to his identity. It seems equally clear that the driver of a vehicle involved in an accident can furnish such identification only by identifying himself as the driver of the vehicle involved in the accident. (§ 20001.)" (*Monismith, supra,* 1 Cal.App.3d at p. 766, italics in original.) ██ ██ ██ Thus, the *Monismith* court concluded the trial court did not err when it instructed the jury "that to comply with section 20001 defendant was under a duty not only to identify himself, as he did, but also to identify himself as the *driver of a vehicle involved in the accident.*" (*Id.* at pp. 767-768, italics in original.)[4]

The facts in *Monismith* are similar to those in the case at bench. In *Monismith,* the defendant's car struck and fatally injured a pedestrian. However, the defendant's companion was actually driving at the time of the accident. Because the companion did not have a driver's license, he asked the defendant to say that he (the defendant) was driving. The defendant returned to the scene of the accident and gave the investigating officers his name, address, registration, and driver's license, but falsely told the officers he was driving. He did not tell the officers his car was involved in the accident, nor did his companion disclose this information. (1 Cal.App.3d at p. 764.) The defendant and his companion both denied to bystanders that their car had struck the victim. The defendant was convicted of violating sections 20001 and 20003 because he failed to disclose his car was involved in the accident, even though he was not actually driving at the time of the accident.[5] (*Monismith, supra,* 1 Cal.App.3d at pp. 764-765, 766.)

If anything, the facts of the present case present a more compelling case in favor of the People's position than those in *Monismith,* because here

---

[4]We agree with this commonsense statutory construction. As the court pointed out in *People* v. *Malcolm* (1975) 47 Cal.App.3d 217, 222 [120 Cal.Rptr. 667]: "When an accused is charged with an offense defined in terms subject to two reasonable constructions, the construction favorable to the defendant is ordinarily adopted. This does not mean, however, that the language of the statute must be stretched and strained beyond the limitation of reason. (*Downing* v. *Municipal Court* (1948) 88 Cal.App.2d 345, 349 [198 P.2d 923].) In *People* v. *Crenshaw* (1946) 74 Cal.App.2d 26, 29 [167 P.2d 781] (quoting with approval from 2 Lewis' Sutherland Statutory Construction (2d ed.), we stated: " 'A penal statute should receive a reasonable and common sense construction, and "its force should not be frittered away by niceties and refinements at war with the practical administration of justice." The principle of strict construction does not allow a court to make that an offense which is not such by legislative enactment; but this does not exclude the application of common sense to the terms made use of in an act in order to avoid an absurdity which the legislature ought not to be presumed to have intended.' " (Cited in *People* v. *Flores* (1996) 51 Cal.App.4th 1199, 1204 [59 Cal.Rptr.2d 637].)

[5]The *Monismith* court noted that in construing sections 20001 and 20003 the courts have held that an owner present at the time of an accident is considered to be a "driver" within the meaning of the pertinent sections, even though he was not actually driving at the time of the accident. (*Monismith, supra,* 1 Cal.App.3d at p. 766.)

Kroncke *was* driving the vehicle at the time of the accident. Nevertheless, both Monismith and Kroncke failed to identify the "driver involved" in their respective accidents.

Kroncke makes several arguments to discredit and distinguish *Monismith*, none of which are persuasive. We note that *Monismith* has been the law of this state for nearly 30 years without drawing criticism from any published case.

First, Kroncke contends *Monismith* erroneously interprets the language of section 20003. We disagree. We agree with *Monismith* that ". . . the code sections are concerned not with just a driver and not with just a vehicle, but with the driver of a vehicle *involved in an accident.*" (1 Cal.App.3d at p. 766, italics in original.) Consequently, to comply in a meaningful way with the statute, a driver must identify himself as the driver of a vehicle involved in the accident.

As the *Monismith* court observed, in understanding the meaning and scope of a criminal statute, we must be guided by the evil the Legislature sought to avert and the method chosen to do so. (*People* v. *Berry* (1991) 1 Cal.App.4th 778, 783 [2 Cal.Rptr.2d 416].) ▮ Moreover, " ' "[t]he primary rule of statutory construction, to which every other rule as to interpretation of particular terms must yield, is that the intention of the legislature must be ascertained if possible, and, when once ascertained, will be given effect, even though it may not be consistent with the strict letter of the statute. . . ." ' " (*Dickey* v. *Raisin Proration Zone No. 1* (1944) 24 Cal.2d 796, 802 [151 P.2d 505, 157 A.L.R. 324], quoted in *Bell* v. *Department of Motor Vehicles* (1992) 11 Cal.App.4th 304, 311 [13 Cal.Rptr.2d 830].) Thus, " '[i]n the analysis of statutes for the purpose of finding the legislative intent, regard is to be had not so much to the exact phraseology in which the intent has been expressed as to the general tenor and scope of the entire scheme embodied in the enactments. [Citation.]' " (*County of Los Angeles* v. *Frisbie* (1942) 19 Cal.2d 634, 639 [122 P.2d 526], quoted in *Bell* v. *Department of Motor Vehicles, supra,* 11 Cal.App.4th at p. 311; see also *People* v. *Jimenez* (1992) 11 Cal.App.4th 1611, 1625 [15 Cal.Rptr.2d 268] [applying similar rules to section 20001], disapproved on another point in *People* v. *Kobrin* (1995) 11 Cal.4th 416, 419, 427 fn. 7 [45 Cal.Rptr.2d 895, 903 P.2d 1027].)

▮ Here, sections 20001 and 20003 are part of a statutory scheme which imposes on drivers the obligation to self-report when the driver's vehicle has been involved in an accident. The purpose of these statutes is "to promote the satisfaction of civil liabilities arising from automobile accidents. . . ." (*California* v. *Byers* (1971) 402 U.S. 424, 430 [91 S.Ct. 1535,

1539, 29 L.Ed.2d 9]; see also *People* v. *Jimenez, supra*, 11 Cal.App.4th at pp. 1625 & 1628, fn. 10.) In those cases where it is not apparent that a person was driving, section 20003 would fail to serve the purpose of the statutory scheme if it did not impose a requirement that the person at the scene disclose that he was the driver of a vehicle involved in the accident.[6]

Second, Kroncke contends *Monismith* "has no precedential value" because that court stated it found no error in the trial court's instructions "under the facts peculiar to this case." (*Monismith, supra*, 1 Cal.App.3d at p. 767.) Obviously, the fact the *Monismith* court was considering particular facts does not deprive the court's statutory interpretation of precedential value. Moreover, as we have already explained, the facts here are closely analogous to those in *Monismith* and, if anything, present a more compelling case in favor of the People's argument.

Third, Kroncke contends *Monismith* is distinguishable because in *Monismith* the vehicle struck a pedestrian, while in the present case Jacobsen jumped from the vehicle. Although Kroncke does not make the argument in so many words, he effectively contends that Jacobsen's decision to jump from Kroncke's vehicle did not constitute a reportable "accident" within the meaning of sections 20001 and 20003. We disagree. In *People* v. *Green* (1950) 96 Cal.App.2d 283 [215 P.2d 127], the court applied section 20001's predecessor statute to a case in which a person fell out of a car as it was making a turn. The court concluded this constituted an accident within the meaning of the statute. (96 Cal.App.3d at pp. 286-289.) The court stated: "As defined in Webster's Dictionary, an accident is an event that takes place without one's foresight or expectation; an undesigned, sudden, and unexpected event." (*Id.* at p. 288.) Certainly, from Kroncke's perspective, Jacobsen's decision to leave the vehicle as he was traveling down the freeway was an event that took place without Kroncke's foresight or expectation. (See also *People* v. *Jimenez, supra*, 11 Cal.App.4th at p. 1625 ["The broad legislative purpose behind the enactment of Vehicle Code section 20001 requires us to give the word 'accident' its broadest possible meaning so as to extend the requirements of the statute to all injury-producing events involving vehicles."].)

Fourth, Kroncke cites *People* v. *Bammes* (1968) 265 Cal.App.2d 626 [71 Cal.Rptr. 415], where the court stated that "Section 20001 does not require

---

[6]In this regard, we note that another part of this statutory scheme—section 20004— imposes a duty to report directly to the California Highway Patrol or police in circumstances where an accident results in death and there are no law enforcement officers on the scene. Like section 20003, section 20004 does not explicitly require that the reporting person state he was involved in an accident.

that the driver involved disclose that he was involved in the accident. He merely is required to identify himself as the driver of a vehicle which was at or near the scene of the accident when it occurred." (*Id.* at p. 635.) However, as Kroncke himself notes, the Supreme Court later disapproved this interpretation of section 20001 in *Byers* v. *Justice Court* (1969) 71 Cal.2d 1039, 1045 [80 Cal.Rptr. 553, 458 P.2d 465]. There, the Supreme Court criticized *People* v. *Bammes, supra,* 265 Cal.App.2d 626, and found that "*Bammes* inaccurately characterized the 'hit-and-run' statute involved in that case (Veh. Code, § 20001), a statute similar in all relevant particulars to the statute involved in the present case . . . . First, although it is true that neither section 20001 nor section 20002 explicitly requires drivers involved in accidents to identify themselves *as* involved drivers, neither can fairly be read to require only that an involved driver identify himself as merely having been 'at or near the scene of the accident when it occurred.' " (*Byers* v. *Justice Court, supra,* 71 Cal.2d at p. 1045, italics in original.) Thus it is *Bammes*, and not *Monismith*, that lacks precedential value on this issue.

Finally, Kroncke contends *Monismith* is undermined by *Byers* v. *Justice Court, supra,* 71 Cal.2d 1039, and *California* v. *Byers, supra,* 402 U.S. 424, both of which concern whether California's accident reporting statutes violate a driver's Fifth Amendment privilege against self-incrimination. We discuss those cases in detail below, but note for now that neither case overrules or undermines *Monismith*'s statutory analysis.

B. *The Statutory Requirement Does Not Violate a Person's Constitutional Right Against Self-incrimination.*

█ Kroncke next contends that if we interpret sections 20001 and 20003 to mean a person must disclose that he was the driver of a vehicle involved in an accident, then those sections would violate the person's Fifth Amendment right against self-incrimination. We disagree.

Both our own Supreme Court (*Byers* v. *Justice Court, supra,* 71 Cal.2d 1039) and the United States Supreme Court (*California* v. *Byers, supra,* 402 U.S. 424) have already addressed the constitutional validity of California's compulsory accident reporting statutes vis-à-vis the Fifth Amendment. █ In *Byers* v. *Justice Court,* our Supreme Court addressed the constitutionality of section 20002, subdivision (a), which required (and still requires) a driver involved in an accident causing property damage to stop and identify himself.[7] (71 Cal.2d at pp. 1041-1042.) The California Supreme Court concluded the required disclosures did in fact compromise a driver's

---

[7]Section 20002, subdivision (a) at the time of Byers's accident provided: " 'The driver of any vehicle involved in an accident resulting in damage to any property including vehicles

Fifth Amendment privilege against self-incrimination. (*Id.* at p. 1047.) The court nevertheless upheld the statute on the ground "that the state may require a person to disclose information otherwise subject to a claim of privilege if in place of the protection conferred by the privilege there is substituted another protection, having the same scope and effect as the privilege, namely, immunity from use of the information or its fruits in connection with a criminal prosecution against the person." (71 Cal.2d at p. 1049.) In short, the court concluded that although the required disclosures might indeed violate the driver's right against self-incrimination, the state could nevertheless compel the disclosures provided the courts granted the driver use immunity with respect to the disclosed information. (*Id.* at pp. 1049-1050 ["[I]f the disclosures compelled by section 20002 . . . and the fruits of such disclosures may not be used in a criminal prosecution relating to the accident, the requirements of the privilege against self-incrimination are met."].)

The United States Supreme Court granted certiorari and vacated the California Supreme Court's decision in *Byers* v. *Justice Court.* (402 U.S. at p. 434 [91 S.Ct. at p. 1541].) In *California* v. *Byers, supra,* 402 U.S. 424, a four-judge plurality of the United States Supreme Court disagreed with the California Supreme Court and concluded that section 20002, subdivision (a)(1)'s[8] disclosure requirements do *not* implicate the right against self-incrimination. The plurality determined that, unlike registration schemes aimed at identifying criminal behavior, the statute in question was essentially regulatory, its purpose being "to promote the satisfaction of civil liabilities arising from automobile accidents." (*Id.* at p. 430 [91 S.Ct. at p. 1539].) Contrary to the kind of disclosure statutes that the court had found self-incriminating, section 20002 was not directed at a " 'highly selective group' " or one " 'inherently suspect of criminal activities,' " but was instead " 'directed at the public at large.' " (402 U.S. at p. 430 [91 S.Ct. at p. 1539].) In sum, the high court found "disclosures with respect to automobile accidents simply do not entail the kind of substantial risk of self-incrimination

---

shall immediately stop the vehicle at the scene of the accident and shall then and there either: (1) Locate and notify the owner or person in charge of such property of the name and address of the driver and owner of the vehicle involved, or; (2) Leave in a conspicuous place on the vehicle or other property damaged a written notice giving the name and address of the driver and of the owner of the vehicle involved and a statement of the circumstances thereof and shall without unnecessary delay notify the police department of the city wherein the collision occurred or, if the collision occurred in unincorporated territory, the local headquarters of the Department of the California Highway Patrol. Any person failing to stop or to comply with said requirements under such circumstances is guilty of a misdemeanor and upon conviction thereof shall be punished by imprisonment in the county jail for not to exceed six months or by a fine of not to exceed five hundred dollars ($500) or by both.' " (*Byers* v. *Justice Court, supra,* 71 Cal.2d at p. 1041, fn. 2.) Compare sections 20001 and 20003, which apply to accidents involving death or injury to persons.

[8]The United States Supreme Court confined its review to this subdivision.

involved in [other cases]" and "the statutory purpose is noncriminal and self-reporting is indispensable to its fulfillment." (*Id.* at p. 431 [91 S.Ct. at p. 1539]; see also *Craib* v. *Bulmash* (1989) 49 Cal.3d 475, 488-489 [261 Cal.Rptr. 686, 777 P.2d 1120]; *Fahlgren* v. *Department of Motor Vehicles* (1986) 186 Cal.App.3d 930, 937-938 [231 Cal.Rptr. 229].)

Justice Harlan, in his concurring opinion, urged there was a "real" and not an "imaginary" risk of self-incrimination in complying with the statute. However, he determined that the "presence of a 'real' and not 'imaginary' risk of self-incrimination is not a sufficient predicate for extending the privilege against self-incrimination to regulatory schemes of the character involved in this case." (*California* v. *Byers, supra,* 402 U.S. at p. 439 [91 S.Ct. at p. 1543] (conc. opn. of Harlan, J.).) He reasoned that California had a vital interest in the individual financial responsibility of those who own and operate vehicles; that "compelled self-reporting is a necessary part of an effective scheme of assuring personal financial responsibility for automobile accidents"; and that to extend the privilege against self-incrimination to the "compelled self-reporting . . . regulatory scheme" will impair the state's capacity to pursue simultaneously the objectives of ensuring financial responsibility for accidents and criminal sanctions to deter dangerous driving. (*California* v. *Byers, supra,* 402 U.S. at p. 448 [91 S.Ct. at p. 1548] (conc. opn. of Harlan, J.).)

■ *California* v. *Byers, supra,* 402 U.S. 424, supports the conclusion that California's accident reporting statutes—including sections 20001 and 20003—do not violate a driver's right against self-incrimination. However, Kroncke contends the plurality based their conclusion on the premise that the statute they were examining required disclosure of *only* the driver's name and identifying information, and did not compel the driver to disclose he was "involved" in an accident. Consequently, Kroncke contends that if we construe section 20003 as requiring the driver to disclose that he was a driver involved in the accident, then the statute would violate the driver's right against self-incrimination. We disagree.

It is true, as Kroncke points out, that the second section of the plurality opinion (and Justice Brennan's dissent) suggests the plurality viewed the statute at issue as requiring the driver to disclose *only* his name and identifying information. (See, e.g., 402 U.S. at pp. 432, 433-434, & 468 [91 S.Ct. at pp. 1539-1541, & 1557-1558] (dis. opn. of Brennan, J.).) Nevertheless, the central reasoning of the plurality was that there was no Fifth Amendment violation because "disclosures with respect to automobile accidents simply do not entail the kind of substantial risk of self-incrimination involved in [other cases]" and ". . . the statutory purpose is noncriminal and

self-reporting is indispensable to its fulfillment." (*Id.* at p. 431 [91 S.Ct. at p. 1539]; see also *Craib* v. *Bulmash, supra,* 49 Cal.3d at pp. 488-489; *Fahlgren* v. *Department of Motor Vehicles, supra,* 186 Cal.App.3d at pp. 937-938.)[9]

After reaching these conclusions, the plurality went on to express an alternative and separate rationale for the result it reached. In the second section of the plurality's opinion, the court stated: *"Even if we were to view the statutory reporting requirement as incriminating in the traditional sense,* in our view it would be the 'extravagant' extension of the privilege Justice Holmes warned against to hold that it is testimonial in the Fifth Amendment sense." (402 U.S. at p. 431 [91 S.Ct. at p. 1539], italics added.) It was in this portion of the opinion that the plurality suggested that the act of stopping and leaving identifying information was a "neutral act" not warranting application of the privilege against self-incrimination. The rationale of the first section of the opinion is not undermined in anyway by this second section. One cannot ignore the implication of such conduct and disclosure by a driver, however. By leaving his name and address, the person depositing the information implicitly discloses he *was* the driver of a vehicle involved in the accident, the one who caused the damage. By describing this disclosure as a "neutral act," the court was merely saying that compulsory self-identification of a driver in an accident does not warrant protection under traditional Fifth Amendment jurisprudence. This is because such compulsory disclosure, while it may reveal that the person was a driver involved in an accident, identifies, but does not necessarily implicate anyone in criminal conduct.[10] The court quickly pointed out: "Whatever the collateral consequences of disclosing [a] name and address, the statutory purpose is to

[9]We find further support for this conclusion in a Virginia Supreme Court case where the court held that the Virginia mandatory accident reporting requirement does not violate the Fifth Amendment. (*Banks* v. *Commonwealth* (1976) 217 Va. 527 [230 S.E.2d 256].) In *Banks,* the Virginia Supreme Court considered the constitutionality of a criminal statute which required, among other things, that a driver involved in an injury-producing accident "report forthwith to the police authority." (230 S.E.2d at p. 257.) The *Banks* court specifically noted that the *California* v. *Byers* court did not consider whether such a reporting requirement would violate the Fifth Amendment. Nevertheless, the *Banks* court held that "when we balance the public interest, on the one hand, and the individual's constitutional claim, on the other, the additional requirement of police reporting does not tip the scales in favor of the accused." (230 S.E.2d at p. 259.) The *Banks* court reached this conclusion even though, in the case before it, complying with the statute would have necessarily disclosed grounds for a criminal prosecution. (230 S.E.2d at p. 258; see also *People* v. *Samuel* (1971) 29 N.Y.2d 252 [327 N.Y.S.2d 321, 328, 277 N.E.2d 381] ["If the purpose of the statute is to incriminate, it is no good. If its purpose is important in the regulation of lawful activity to protect the public from significant harm, especially to the person but also to property, and only the incidental effect is occasionally to inculpate, then the statute is good within constitutional limitations."].)

[10]As the Supreme Court observed in *California* v. *Byers,* California's accident disclosure statutes are "directed at all persons—here all persons who drive automobiles in California. This group, numbering as it does in the millions, is so large as to render § 20002 (a)(1) a statute 'directed at the public at large.' [Citations.] It is difficult to consider this group as either 'highly selective' or 'inherently suspect of criminal activities.' Driving an automobile,

implement the state police power to regulate use of motor vehicles." (*California v. Byers, supra,* 402 U.S. at p. 432 [91 S.Ct. at p. 1540].)[11]

In his concurring opinion, Justice Harlan expressed concern that the privilege might impair the state's interest in ensuring financial responsibility and deterring dangerous driving through criminal sanctions. He explained that the cases in which the Supreme Court found that disclosure requirements had violated the privilege against self-incrimination all involved registration laws that focused almost exclusively on criminal conduct. "In contrast," he observed, "the 'hit and run' statute [in *Byers*] predicates the duty to report on the occurrence of an event which cannot, without simply distorting the normal connotations of language, be characterized as 'inherently suspect' . . . . And, having initially specified the regulated event— i.e., an automobile accident involving property damage—in the broadest terms possible consistent with the regulatory scheme's concededly noncriminal purpose, the State has confined the portion of the scheme now before us . . . to the minimal level of disclosure . . . ." (402 U.S. at p. 456 [91 S.Ct. at p. 1552] (conc. opn. of Harlan, J.); see also *Craib* v. *Bulmash, supra,* 49 Cal.3d at pp. 488-489 .)

Justice Harlan went on to reason: "California's decision to compel Byers to stop after his accident and identify himself will not relieve the State of the duty to determine, entirely by virtue of its own investigation after the coerced stop, whether or not any aspect of Byer's behavior was criminal. Nor will it relieve the State of the duty to determine whether the *accident which Byers was forced to admit involvement in* was proximately related to the aspect of his driving behavior thought to be criminal. In short, Byers *having once focused attention on himself as an accident participant,* the State must still bear the burden of making the main evidentiary case against Byers as a violator of [a criminal statute]. To characterize this burden as a merely ritualistic confirmation of the 'conviction' secured through compliance with the reporting requirement in issue would be a gross distortion of reality

unlike gambling, is a lawful activity. Moreover, it is not a criminal offense under California law to be a driver 'involved in an accident.' An accident may be the fault of others; it may occur without any driver having been at fault. No empirical data are suggested in support of the conclusion that there is a relevant correlation between being a driver and criminal prosecution of drivers. So far as any available information instructs us, most accidents occur without creating criminal liability even if one or both of the drivers are guilty of negligence as a matter of tort law." (*California* v. *Byers, supra,* 402 U.S. at pp. 430-431 [91 S.Ct. at p. 1539].) In our view, this reasoning applies with equal force to section 20003, the statute we consider in this case. There is nothing in the record before us to suggest otherwise.

[11]We reject Kroncke's contention that *California* v. *Byers* somehow "overruled" *Monismith*'s statutory interpretation of sections 20001 and 20003. It is well established that state courts—not the federal courts—have responsibility for interpreting their own state statutes. (*Campbell* v. *Superior Court* (1996) 44 Cal.App.4th 1308, 1317 [52 Cal.Rptr.2d 385]; 9 Witkin, Cal. Procedure (3d. ed. 1985) Appeal. § 781, pp. 751-753.)

. . . . [¶] . . . [¶] Considering the noncriminal governmental purpose in securing the information, the necessity for self-reporting as a means of securing the information, and the nature of the disclosures involved, I cannot say that the purposes of the Fifth Amendment warrant imposition of a use restriction as a condition on the enforcement of this statute." (402 U.S. at pp. 457-458 [91 S.Ct. at pp. 1552-1553], italics added, fns. omitted (conc. opn. of Harlan, J.).) Kroncke's name could easily be substituted for Byers's; Justice Harlan's reasoning applies with equal force and the same conclusion should obtain.

Thus, we find no Fifth Amendment violation under either the plurality or concurring opinions in *California* v. *Byers, supra,* 402 U.S. 424.

The dissent's conclusion that it violates the Fifth amendment to require a driver involved in an accident to identify himself as such, is based on the dissent's very different perspective on the issue before us. We believe that in light of the Fifth Amendment's underlying purpose, in an increasingly complex society, the ability to invoke the privilege may be reduced when invocation would interfere with the effective operation of a generally applicable statute aimed at regulating civil responsibility. It is the context in which the disclosure is required and the underlying purpose of the disclosure that is most important and determines the analytical framework. We derive this framework from reading *California* v. *Byers, supra,* 402 U.S. 424, and *Baltimore Dept. of Social Servs.* v. *Bouknight* (1990) 493 U.S. 549 [110 S.Ct. 900, 107 L.Ed.2d 992] and the Supreme Court's analysis of its own precedent that each of those cases contains. The dissent believes it is the substance of the disclosure that controls the Fifth Amendment analysis. As we have indicated, however, the central teaching of *California* v. *Byers* is that "disclosures with respect to automobile accidents simply do not entail the kind of substantial risk of self-incrimination involved in [other cases]" and "the statutory purpose [of the hit-and-run statutes] is noncriminal and self-reporting is indispensable to its fulfillment." (*Id.* at p. 431 [91 S.Ct. at p. 1539]; see also *Craib* v. *Bulmash, supra,* 49 Cal.3d at pp. 488-489; *Fahlgren* v. *Department of Motor Vehicles, supra,* 186 Cal.App.3d at pp. 937-938.) ■ Thus in cases which involve the "[t]ension between the State's demand for disclosures and the protection of the right against self-incrimination," we must balance the public need against the individual claim to constitutional protection in deciding whether the privilege applies. (*California* v. *Byers, supra,* 402 U.S. at p. 427 [91 S.Ct. at p. 1537].) Contrary to the dissent's assertion, the "testimonial" character of the disclosure is not dispositive. As the United States Supreme Court has more recently observed: "The possibility that [a law] will compel testimonial assertions that may prove incriminating does not, in all contexts, justify invoking the privilege to resist production." (*Baltimore Dept. of Social Servs.* v. *Bouknight, supra,* 493 U.S. 549, 555 [110 S.Ct. 900, 905].)

The dissent discounts the relevance of *Bouknight,* by claiming the Supreme Court's analysis was based on the fact that Ms. Bouknight, who was ordered to produce a child over whom she had custody, had accepted child custody under conditions to which she had agreed. (Dis. opn., *post,* at pp. 1572-1573.) Although this is factually true, the important legal point in *Bouknight* was similar to that in *California* v. *Byers, supra,* 402 U.S. 424. As the *Bouknight* court put it, "Bouknight may not invoke the privilege to resist the production order because she has assumed custodial duties related to production *and because production is required as part of a noncriminal regulatory regime.* [¶] The Court has on several occasions recognized that the Fifth Amendment privilege may not be invoked to resist compliance with a regulatory regime constructed to effect the State's public purposes unrelated to the enforcement of its criminal law." (493 U.S. at pp. 555-556 [110 S.Ct. at p. 905], italics added.) In fact, the *Bouknight* court specifically cited *California* v. *Byers* as "confirm[ing] that the ability to invoke the privilege may be greatly diminished when invocation would interfere with the effective operation of a generally applicable, civil regulatory requirement." (493 U.S. at pp. 557-558 [110 S.Ct. at p. 906].) The *Bouknight* court noted that the *California* v. *Byers* plurality focused on the insubstantial risk of incrimination and the noncriminal nature and broad applicability of the California statute, while the concurrence, although acknowledging that "in particular cases the California statute would compel incriminating testimony," nevertheless concluded that the noncriminal purpose and the general applicability of the reporting requirement demanded compliance even in such cases. (*Ibid.*)

The dissent also observes the *Bouknight* court went on to note that the "testimonial aspects" involved in producing the child might require a limitation on the use of those testimonial aspects in a subsequent criminal proceeding. (Dis. opn., *post,* at p. 1572.) More precisely, after holding that Ms. Bouknight could not invoke the privilege to resist the production order, the *Bouknight* court stated: "We are not called upon to define the precise limitations that may exist upon the State's ability to use the testimonial aspects of Bouknight's act of production in subsequent criminal proceedings. But we note that imposition of such limitations is not foreclosed." (493 U.S. at p. 561 [110 S.Ct. at p. 908].) Similarly, in this case, we are not called upon to define the precise limitations on the state's ability to *use* the "testimonial" aspect of the required disclosures. We hold only that a person may not rely on the Fifth Amendment privilege to resist making the disclosure in the first instance.

 In contrast to our analysis, the dissent concludes that the central issue is whether the disclosures the statute requires are "testimonial in nature." (Dis. opn., *post,* at pp. 1561-1564.) Even if we were to agree that

this is the central issue in this case, we believe the dissent has drawn an erroneous distinction between the disclosures the Supreme Court found proper in *California* v. *Byers*, and the disclosure the dissent claims is improper here.

Section 20003 requires a driver involved in an accident to disclose "his or her name, current residence address, . . . the registration number of the vehicle he or she is driving, and the name and current residence address of the owner to . . . any traffic or police officer at the scene of the accident." We believe the dissent would agree that these explicit disclosures are permitted under *California* v. *Byers*.[12] However, the dissent attempts to draw a distinction between these disclosures, which it considers nontestimonial in nature, and the driver's disclosure that he was driving a vehicle involved in an accident, which it considers testimonial in nature. The distinction does not withstand scrutiny.

■ As the dissent notes, the Supreme Court has held that " '[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information.' " (Dis. opn., *post*, at p. 1562, quoting *Doe* v. *United States* (1988) 487 U.S. 201, 210 [108 S.Ct. 2341, 2347-2348, 101 L.Ed.2d 184].) In the dissent's own words, "a testimonial communication is one in which a person reveals knowledge or information from his own mind. Conversely, if all that is required is the production of 'real or physical evidence' or noncommunicative conduct the privilege is not violated." (Dis. opn., *post*, at p. 1562.)

■ In our view, when a driver at the site of an accident gives his name, current residence address, registration number, and the name and current residence address of the vehicle's owner, he reveals or discloses *information*—as opposed to "real or physical evidence"—that may not otherwise be available to the prosecuting authorities. We fail to see how disclosing such identifying information is any less "testimonial" than disclosing that he was the driver of a vehicle involved in an accident. Moreover, the required disclosure of this identifying information also carries risks of self-incrimination—it could reveal, for example, that the driver was unlicensed, had outstanding warrants, or was driving a stolen car. While any of this information could provide a link leading to criminal prosecution, the United States Supreme Court has concluded the Fifth Amendment does not make statutes requiring disclosure of identifying information in this context unconstitutional.

---

[12]The statute the *California* v. *Byers* court approved required the driver of a vehicle involved in an accident resulting in property damage to " '[l]ocate and notify the owner or person in charge of such property of the name and address of the driver and owner of the vehicle involved . . . .' " (402 U.S. at p. 426 [91 S.Ct. at p. 1537].)

In short, it appears the United States Supreme Court approaches the analysis first by looking at the nature of the statute requiring the disclosure. If the statute aims to regulate conduct in which the state has a legitimate interest, compliance serves to achieve important state goals of a noncriminal nature, and the disclosures do not entail a "substantial risk" of self-incrimination, then the court will not permit the Fifth Amendment privilege to block the regulatory scheme. Only when the law in question would primarily advance the state's penal interests, or create a substantial risk of self-incrimination, does the Supreme Court appear willing to extend Fifth Amendment protection. (See *Banks* v. *Commonwealth, supra,* 230 S.E.2d at p. 259; *People* v. *Samuel, supra,* 327 N.Y.S.2d 321, 325, 328.) Thus the court has upheld an order requiring a mother to produce or disclose the location of an abused child over whom she had custody (*Baltimore Dept. of Social Servs.* v. *Bouknight, supra,* 493 U.S. 549), and a statute requiring a businessman to produce records he has maintained to show compliance with the Emergency Price and Control Act (*Shapiro* v. *United States* (1948) 335 U.S. 1, 17-18, 32 [68 S.Ct. 1375, 1384-1385, 92 L.Ed. 1787]). In each of these cases, the parties were required to disclose knowledge and information otherwise unknown to the government; nevertheless, the United States Supreme Court denied their claims of Fifth Amendment protection.

Sections 20001, 20002, 20003, and 20004 all impose obligations on those who are privileged to drive in California. The Legislature requires drivers to self-report the fact of an accident and identify themselves and the owner of the vehicle involved. The state grants a substantial privilege when it licenses drivers to use California roadways. The exercise of that privilege includes the potential of placing others at significant risk, and may lead to injury and death as happened here. The statutes require the driver/owner to provide identifying information regarding both himself and the vehicle so that those who have been damaged or injured can collect from those who are at fault. The legitimate aim of the statutes is civil remediation and regulation of drivers who use the roadways in California. A driver in most circumstances will comply without providing any incriminating "testimony" against himself and is certainly free to claim a Fifth Amendment privilege after he has met the statutes' requirements.

Kroncke testified at trial that he provided the officers at the scene with his name, driver's license and vehicle registration. He also claimed to have identified himself, at least implicitly, as the driver of the vehicle involved in the accident.[13] Like Kroncke, most citizens understand the reasonable and constitutional reporting requirements the Vehicle Code imposes. The dissent,

---

[13]Although Kroncke's testimony was contradicted by the officers, by all accounts given at trial, he gave his name, address and the license number of the vehicle he was driving to the

in its scholarly discussion of the Fifth Amendment, unnecessarily finds a conflict between a Constitutional right and a statutory responsibility reasonably imposed for civil purposes. The right at issue here, for a citizen to be free from being "compelled in any criminal case to be a witness against himself," (U.S. Const., 5th Amend.) is not violated when a driver is compelled pursuant to section 20003 to identify himself as the driver of an automobile involved in an accident. The state still bears the responsibility of independently proving the driver's conduct was criminal. The Fifth Amendment was never intended to be a refuge for those facing civil liability. It was not intended to force investigating agencies, or citizens, to invest time and energy puzzling out who was driving when injury accidents occur. Nor was it intended to permit drivers to engage in the obfuscation even Kroncke knew was wrong.

In sum, we follow what we believe to be the law announced in *California v. Byers*, and conclude that the Fifth Amendment privilege against self-incrimination does not relieve a California driver of his duty to comply with the reporting requirements of sections 20001 and 20003, including his duty to identify himself as the driver of a vehicle involved in the accident.

C., D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

III

DISPOSITION

The judgment is affirmed.

Walker, J., concurred.

---

officers at the scene of the accident. The dissent believes he complied with the requirements of sections 20001 and 20003 and did not need to do more. We agree that a driver may invoke a privilege under the Fifth Amendment and refuse to discuss the circumstances or details of the accident if he so chooses. He may not, however, invoke the privilege to avoid identifying himself as the driver. Kroncke certainly waived any Fifth Amendment privilege when he voluntarily sought to "set the story straight" and disclosed to Detective Carroll on November 3 that he was the driver. Never has he claimed his earlier failure to say he was driving was based on a belief that what he said might be incriminatory. The Fifth Amendment does not license prevarication. Had Kroncke simply complied with the statute, and had he later been prosecuted for a crime in which the state sought to use his admission of driving, we would be presented with the issue of whether his admission could be used in the criminal case against him. We disagree with the dissent's view that the *use* of his disclosure is presented on these facts. It is not his admission of being the driver that is being used, it is his failure to do so. If Kroncke had complied with the statute as we construe it, one thing is clear: he would *not* have been prosecuted for the felony which forms the basis of this appeal.

　*See footnote, *ante,* page 1535.

**CORRIGAN, Acting P. J.,** Concurring and Dissenting.—I respectfully dissent from the conclusion of my learned colleagues with regard to appellant's felony conviction. This case involves a very narrow issue: the scope of a motorist's responsibility to stop and provide identifying information under Vehicle Code section 20003.

Vehicle Code section 20003 as enacted by the Legislature essentially requires a motorist involved in an accident causing death or injury to do two things, 1) stop at the scene and 2) provide identifying information about himself, the car and the owner.[1] The majority adds an additional requirement: the affirmative disclosure to a police officer that the motorist was involved in the accident. In amending the statute by judicial gloss, the majority ignores settled rules of statutory construction, violates the separation of powers and runs afoul of the Fifth Amendment.

## I. *Judicial Legislation*

The first difficulty is that the majority seeks to make criminal something the Legislature has not. The duly enacted law makes it a crime to fail to stop and provide identifying information. The majority would declare it a crime to fail to *explicitly admit* involvement in an accident resulting in death or injury. The majority asserts the statutory language demonstrates that the Legislature intended to require this admission. I disagree. In referring to "a driver involved in an accident" the statute defines the class of drivers compelled to stop and provide identification. It does not, by its plain language, compel the explicit admission of involvement. If the language is ambiguous, standard rules of construction require that a statute imposing penal consequences be narrowly construed. (See generally, 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Introduction to Crimes, § 28, pp. 37-38.)[2] When the government requires its citizens to do something under threat of penal consequence, its pronouncement must be clear. A citizen is

---

[1] Another provision, that the driver render aid to the injured, is not at issue here.

[2] The majority mentions a number of cases in support of their expansive construction. (Maj. opn., *ante*, at pp. 1546-1547.) Several of them are civil cases and are distinguishable on that basis. The two criminal cases which they cite do not support the conclusion they would draw. In *People v. Berry* (1991) 1 Cal.App.4th 778 [2 Cal.Rptr.2d 416] the court interpreted a statute to exclude a defense claimed by Berry. It did not add a new criminal element, and does not stand for the proposition that courts may do so. The defendant in *People v. Jimenez* (1992) 11 Cal.App.4th 1611 [15 Cal.Rptr.2d 268] intentionally rammed another car, inflicting substantial injury on a passenger in the rammed vehicle. Among other charges, he was accused of violating Vehicle Code section 20001 because he did not stop at the scene and identify himself. Jimenez urged that he was not required to do so because he intentionally rammed the other car. Thus, he argued, the event was not an "accident" falling within the statute. The *Jimenez* court rejected this novel claim, concluding the term "accident" encompassed defendant's behavior. Again, *Jimenez* did not add a new criminal element to the

not obligated to guess what conduct is required or suffer a criminal penalty if he divines wrongly. He is required to do what the law says, but no more. This concept is a venerable one. Over 100 years ago, Justice Bradley in *Boyd v. United States* (1886) 116 U.S. 616, 627 [6 S.Ct. 524, 530-531, 29 L.Ed. 746] quoted Lord Camden who wrote a century before *Boyd*. In *Entick v. Carrington and Three Other King's Messengers* (1765) 19 Howell's State Trials 1029, 1066, Lord Camden wrote: "If it is law, it will be found in our books; if it is not to be found there, it is not law." If the Legislature wants to clarify its requirement, it is certainly free to do so. We are not empowered to criminalize conduct by judicial ukase, or to punish that which the Legislature has not brought within its penal reach. To attempt to do so is a violation of the separation of powers provision of the California Constitution. (Art. III, § 3; see also *People v. Lim* (1941) 18 Cal.2d 872 [118 P.2d 472]; *Chapman v. Aggeler* (1941) 47 Cal.App.2d 848, 853 [119 P.2d 204].) Even if the Legislature had passed the legislation proposed by the majority, it would run afoul of the protections of the Fifth Amendment.

It is the majority's expansion of the statute that creates the constitutional infirmity, as will be discussed below. The statute as written is sound. We should construe the statute narrowly to achieve its purpose. The aim of the statute is to promote the satisfaction of civil liabilities arising from automobile accidents. (Maj. opn., *ante*, at pp. 1546-1547; *California v. Byers* (1971) 402 U.S. 424, 430 [91 S.Ct. 1535, 1539, 29 L.Ed.2d 9] (*Byers*).) To achieve this purpose, the Legislature recognized that we live in an increasingly anonymous society. If motorists could leave the scene of an accident without identifying themselves, the satisfaction of civil liability would be made almost impossible. Thus, the law requires a motorist to stop and provide identification before receding into the nameless crowd. Armed with that identity, a civil litigant, or criminal investigator can conduct further investigation and seek appropriate legal redress.[3] The Legislature enacted a statute designed to secure identity. The majority rewrites it to be a statute which facilitates the building of a case.

The majority relies in part on *People v. Monismith* (1969) 1 Cal.App.3d 762 [81 Cal.Rptr. 879] (*Monismith*), the opinion of a two-judge panel. The

---

statute. Indeed, the court quoted the settled rule for interpretation of criminal statutes: "If a penal statute is susceptible of more than one meaning, the statute must be construed in a defendant's favor unless such a construction would be unreasonable, absurd or contrary to the legislative intent underlying the statute. [Citations.]" (*People v. Jimenez, supra,* 11 Cal.App.4th at p. 1626.)

[3]Indeed, that is what happened here. Because they had his name and address, investigators later interviewed Kroncke, who ultimately admitted his involvement. It is true that Kroncke originally lied to investigators. That act was a crime for which he has properly been convicted. The law can punish someone who lies during an investigation. What it cannot do is force him to incriminate himself.

case did reach the conclusion noted by the majority. However, the opinion is bereft of either apposite authority or compelling logic. The *Monismith* court accurately pointed out that the statute "is designed to prevent the driver of a car involved in an accident from leaving the scene without furnishing information *as to his identity.*" (*Id.* at p. 766, italics added.) The court then vaulted to a conclusion it did not even attempt to logically defend: "It seems equally clear that the driver of a vehicle involved in an accident can furnish such identification only by identifying himself as the driver of the vehicle involved in the accident." (*Ibid.*) Such a conclusion is not clear at all.

A driver can comply with the statute by stopping and providing the statutorily required data. Such conduct would fulfill the statutory goal of preventing drivers from leaving the scene unidentified. If, having stopped and given the facts enumerated by statute, the driver's involvement is evident, or later discovered, so be it. If not, "our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by . . . compelling it from his own mouth." (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 460 [86 S.Ct. 1602, 1620, 16 L.Ed.2d 694, 10 A.L.R.3d 974].) The *Monismith* court, in its brief opinion, did not address the issue of testimonial communication in any way. The *Monismith* court did not do so because it recognized the immunity articulated by the California Supreme Court in *Byers* v. *Justice Court* (1969) 71 Cal.2d 1039 [80 Cal.Rptr. 553, 458 P.2d 465]. (*Monismith, supra,* 1 Cal.App.3d at p. 767.) Only later did the United States Supreme Court decide *Byers.*

The majority writes that "*Monismith* has been the law of this state for nearly 30 years without drawing criticism from any published case." (Maj. opn., *ante,* at p. 1546.) In the 30 years since *Monismith* was decided it has also never been cited as authority for the majority's proposition. Indeed, it has been cited in a grand total of one published decision. *People* v. *Bautista* (1990) 217 Cal.App.3d 1 [265 Cal.Rptr. 661], referred to *Monismith* in deciding whether a Vehicle Code section 20001 conviction was a crime of moral turpitude which could be used to impeach an accused burglar. It must be remembered that *Monismith* was decided when the law of California, recognizing the Fifth Amendment problem, extended use immunity to one who admitted he had been in an accident. The case has not been tested in the 30 years since its publication. Its vitality in the wake of *Byers* is suspect at best. *Monismith* is far too slender a reed to support the significant constitutional conclusion the majority seeks to build upon it.

## II. *The Fifth Amendment*

It should be noted at the outset that this kind of case will arise but rarely. In the vast majority of instances, if a driver stops his car at the scene of a

death or injury-causing accident, it will be evident from the observable circumstances such as body damage, paint transfers and so on that the car was, indeed, involved in the accident. Other witnesses may have seen the accident; so involvement will be clear and the only outstanding question will be identity. Here we deal with the unusual case in which the involvement is not evident. In such a case, can the statute require a motorist to provide law enforcement with the majority's compelled admission? Resolution of the question turns on the extent of the Fifth Amendment's protection against self incrimination. This inquiry, in turn, revolves around whether such a disclosure is testimonial in nature and whether it involves a substantial risk of self-incrimination.

## A. *Testimonial Communications*

The United States Supreme Court has addressed the testimonial question in a number of different contexts. Examination of this body of precedent reveals that the disclosure in question here is testimonial.

In *Malloy* v. *Hogan* (1964) 378 U.S. 1 [84 S.Ct. 1489, 12 L.Ed.2d 653], the court held the Fifth Amendment limitations on governmental action apply to the states under the authority of the Fourteenth Amendment. In doing so the court observed: "Governments, state and federal, are thus constitutionally compelled to establish guilt by evidence independently and freely secured, and may not by coercion prove a charge against an accused out of his own mouth. Since the Fourteenth Amendment prohibits the States from inducing a person to confess through 'sympathy falsely aroused,' [citation], . . . it follows *a fortiori* that it also forbids the States to resort to imprisonment, as here, to compel him to answer questions that might incriminate him." (378 U.S. at p. 8 [84 S.Ct. at p. 1493].) The court went on to observe: "The Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." (*Ibid.*)

The Supreme Court examined the scope of the privilege two years later in *Schmerber* v. *California* (1966) 384 U.S. 757 [86 S.Ct. 1826, 16 L.Ed.2d 908] (*Schmerber*). Following an accident, Schmerber had been arrested for drunk driving. Schmerber's blood was drawn, without his consent, at the direction of a police officer. The blood sample revealed the presence of alcohol. Schmerber argued that compelling him to give a blood sample violated his Fifth Amendment privilege. In ruling to the contrary the court held: "[T]he privilege protects an accused only from being compelled to

testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature, . . ." (*Id.* at p. 761 [86 S.Ct. at p. 1830].)

*Doe* v. *United States* (1988) 487 U.S. 201 [108 S.Ct. 2341, 101 L.Ed.2d 184] turned squarely upon an interpretation of the meaning of the term "testimonial." Doe claimed the Fifth Amendment prevented the government from requiring that he sign a release authorizing foreign banks to turn over certain records. The court concluded that the signing of the release was not a "testimonial communication." Justice Blackmun explained: "[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information." (487 U.S. at p. 210 [108 S.Ct. at p. 2347].) "It is the 'extortion of information from the accused,' [citation], the attempt to force him 'to disclose the contents of his own mind,' [citation], that implicates the Self-Incrimination Clause. [Citation.]" (*Id.* at p. 211 [108 S.Ct. at p. 2348].) "These policies [upon which the privilege is founded] are served when the privilege is asserted to spare the accused from having to reveal, directly or indirectly, his *knowledge of facts relating him to the offense* or from having to share his thoughts and beliefs with the Government." (*Id.* at p. 213 [108 S.Ct. at p. 2349], italics added.)

Numerous cases have concluded that a variety of behaviors and disclosures are nontestimonial in nature. Thus, individuals may be required to provide fingerprints (*People* v. *Bryant* (1969) 275 Cal.App.2d 215 [79 Cal.Rptr. 549]), give blood samples (*Schmerber, supra,* 384 U.S. 757), stand in a lineup (*United States* v. *Wade* (1967) 388 U.S. 218 [87 S.Ct. 1926, 18 L.Ed.2d 1149]), produce handwriting exemplars (*Gilbert* v. *California* (1967) 388 U.S. 263 [87 S.Ct. 1951, 18 L.Ed.2d 1178]), wear certain clothing (*Holt* v. *United States* (1910) 218 U.S. 245 [31 S.Ct. 2, 54 L.Ed. 1021]; *People* v. *White* (1968) 69 Cal.2d 751 [72 Cal.Rptr. 873, 446 P.2d 993]), and turn over records or other items (*Fisher* v. *United States* (1976) 425 U.S. 391 [96 S.Ct. 1569, 48 L.Ed.2d 39]). An analysis of this body of authority teaches that a testimonial communication is one in which a person reveals knowledge or information from his own mind. Conversely, if all that is required is the production of "real or physical evidence" or noncommunicative conduct, the privilege is not violated. "[T]he protection of the privilege reaches an accused's communications, whatever form they might take, . . ." (*Schmerber, supra,* at pp. 763-764 [86 S.Ct. at p. 1832].)

What the majority would require, under compulsion of fine or criminal confinement for failure, is the production of *testimonial* information, communicative information of the motorist's "knowledge of facts relating him to the offense," of the "contents of his own mind."

The majority takes issue with the conclusion that a compelled admission that a driver was involved in an accident causing death or injury is a testimonial communication. "We fail to see how disclosing such identifying information is any less 'testimonial' than disclosing that he was the driver of a vehicle involved in an accident. . . . While any of this information could provide a link leading to criminal prosecution, the United States Supreme Court has concluded the Fifth Amendment does not make [the] statute[] . . . unconstitutional." (Maj. opn., *ante*, at p. 1555.) The reality is that merely providing identification is fundamentally different from admitting involvement in an accident causing death or injury. In *Byers*, Justice Burger classified such identifying information as "neutral." (*Byers, supra*, 402 U.S. at pp. 431-432 [91 S.Ct. at pp. 1539-1540].) The majority cites not a single case holding that providing identification is a testimonial communication or implicates the Fifth Amendment.

On the contrary, numerous cases have upheld the compulsion of identification, even by those in custody and upon specific questioning by law enforcement. (See, e.g., *People* v. *Hall* (1988) 199 Cal.App.3d 914 [245 Cal.Rptr. 458] and *People* v. *Powell* (1986) 178 Cal.App.3d 36 [223 Cal.Rptr. 475].) The question in determining whether a disclosure is testimonial is not, as the majority implies, whether the disclosure facilitates further investigation of a crime. Standing in a lineup or providing fingerprints obviously does so. The question, as the Supreme Court has explained, is whether the state has compelled an individual "to disclose the contents of his own mind"; to reveal "his knowledge of facts relating him to the offense." Indeed, it is difficult to imagine a more direct compulsion of one's "knowledge of facts relating him to the offense" than to compel him to reveal he killed or injured someone while driving.

As the majority points out,[4] the act of stopping and providing identification carries with it some *implicit* meaning. Most conduct does. Of course, a motorist may stop and produce identification for reasons other than admitting culpability. He may stop as a witness. He may stop to aid the injured. He may stop out of curiosity. Even if one interpretation of such conduct supports an inference of involvement, it is not the only reasonable conclusion available. The majority would compel a motorist to remove all doubt by confessing involvement.

The majority quite rightly notes the Supreme Court's several references to balance. It is precisely at the point between nontestimonial conduct and

---

[4]"One cannot ignore the implication of such conduct and disclosure by a driver, however. By leaving his name and address, the person depositing the information implicitly discloses he *was* the driver of a vehicle involved in the accident, the one who caused the damage." (Maj. opn., *ante*, at p. 1551.)

explicit admission that the court strikes the all-important balance. The majority's central error is that they place the scales in the wrong place. Rather than acknowledging the court's reliance on the long-standing concept of testimonial assertions, the majority sets the balance elsewhere, concluding that compulsion of an explicit admission is permissible if the motives are pure. No court has gone that far; nor should we.

The majority accurately observes: "By describing this disclosure as a 'neutral act,' the [*Byers*] court was merely saying that compulsory self-identification of a driver in an accident does not warrant protection under traditional Fifth Amendment jurisprudence." (Maj. opn., *ante*, at p. 1551.) They go astray with their next sentence which contains the *majority's* rationale, not that of the Supreme Court: "This is because such a compulsory disclosure, while it may reveal that the person was a driver involved in an accident, identifies, but does not necessarily implicate anyone in criminal conduct." (*Ibid.*) The majority's conclusion is an unsound extension of the *Byers* property damage scenario. A motorist legally compelled to admit he has just killed or injured someone directly implicates himself and runs a substantial risk of incrimination, bringing the Fifth Amendment into play.

The majority attempts to avoid the conclusion that producing identification is not testimonial by noting that doing so "could provide a link leading to criminal prosecution." (Maj. opn., *ante*, at p. 1555.) As indicated earlier, a Fifth Amendment analysis often involves two issues: 1) whether the information is testimonial; and 2) whether its compulsory revelation presents a significant risk of incrimination. The "link in the chain" question relates to the risk of incrimination, not the testimonial nature of the information.

## B. *Risk of Incrimination*

The Supreme Court has also visited the issue of whether a compelled disclosure presents a substantial risk of incrimination in a number of cases. One such case is *Marchetti* v. *United States* (1968) 390 U.S. 39 [88 S.Ct. 697, 19 L.Ed.2d 889] (*Marchetti*) which dealt with statutes regulating taxation of wagers. Under the statutes, those who accept wagers were required to pay occupational taxes and to register with the local Internal Revenue director. Registrants were required to admit they were in the business of accepting wagers. The issue, as framed by Justice Harlan for the majority, was "whether the methods employed by Congress in the federal wagering tax statutes are, in this situation, consistent with the limitations created by the privilege against self-incrimination guaranteed by the Fifth Amendment." (*Id.* at p. 44 [88 S.Ct. at p. 700].) The court concluded the statutes did violate the Fifth Amendment. In doing so, Justice Harlan observed that

gambling is a highly regulated enterprise and numerous statutes impose criminal penalties for its pursuit. He also noted that the information acquired by the statutes at issue would be readily available to prosecuting authorities.

Justice Harlan explained the court's analysis in this manner: "The central standard for the privilege's application has been whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." (*Marchetti, supra*, 390 U.S. at p. 53 [88 S.Ct. at p. 705]). "In these circumstances, it can scarcely be denied that the obligations to register and to pay the occupational tax created for petitioner 'real and appreciable,' and not merely 'imaginary and unsubstantial,' hazards of self-incrimination. [Citations.] Petitioner . . . was required, on pain of criminal prosecution, to provide information which he might reasonably suppose would be available to prosecuting authorities, and which would surely prove a significant 'link in a chain' of evidence tending to establish his guilt." (*Id.* at p. 48 [88 S.Ct. at pp. 702-703], fn. omitted.)

Application of the *Marchetti* principles shows the majority's requirement would suffer the same infirmity. The statute, by its language, does not apply to the public at large, or even to all drivers. Its obligations fall on only those drivers involved in accidents that result in death or injury. The conduct of drivers who cause serious accidents is addressed by numerous penal provisions which punish unsafe driving. The required admission created by the majority would be given directly to a law enforcement officer and readily available to prosecuting authorities.

An officer, called to the scene of an accident in which someone is killed or injured, obviously investigates a very serious circumstance. Any driver "involved" in such an accident is necessarily and reasonably suspected of potentially criminal conduct. A significant proportion of these accidents will involve one or more Vehicle Code violations: speeding (Veh. Code, § 22348 et seq.), driving under the influence (Veh. Code, § 23152 et seq.), following too closely (Veh. Code, § 21703), changing lanes unsafely (Veh. Code, § 21658) or driving recklessly (Veh. Code, § 23103), to name but a few. If death results, vehicular manslaughter (Pen. Code, § 192, subd. (c)) might very well be charged, predicated upon a Vehicle Code violation. It is certainly true that a driver may drive perfectly and conform with every law and yet be blamelessly involved in a serious accident. What is important for our analysis is not that some conduct may be innocent, but rather, that much driving which causes death or injury will, indeed, be criminal. Further investigation is obviously needed to determine who, if anyone, is at fault. A driver so involved does not face a benign situation in which mere administrative details are at issue. Requiring a motorist to reveal his involvement

in the accident when it is not otherwise apparent, requires him to provide factual information to the government which may very well be used later to prosecute him. One compelled to admit that he just killed or injured someone while driving faces far more than a "trifling or imaginary" risk of incrimination.

Based on long-standing United States Supreme Court jurisprudence the requirement imposed by the majority violates the Fifth Amendment. The admission they would compel is testimonial in nature. Its effect is that the person making such an admission runs a substantial risk of incrimination.

### The Byers Cases

The majority relies heavily upon the analysis of *Byers* v. *Justice Court, supra,* 71 Cal.2d 1039 and *Byers, supra,* 402 U.S. 424. In *Byers* the United States Supreme Court reviewed the California Supreme Court's disposition in the same case. The celebrated Mr. Byers was in an auto accident and fled without providing the statutorily required identification. It was his failure to stop and produce identification that was at issue before both supreme courts.

The majority's reliance on *Byers* is misplaced for three reasons. First, *Byers* did not resolve, or even address the judicially compelled admission that is at issue here. Second, the majority inaccurately apprehends the precedential value *Byers* does have. Third, they extend *Byers* beyond its holding.

*Byers* addressed a very precise issue. "This case presents the narrow but important question of whether the constitutional privilege against compulsory self-incrimination is infringed by California's so called 'hit and run' statute which requires the driver of a motor vehicle involved in an accident to *stop at the scene and give his name and address*." (*Byers, supra,* 402 U.S. at p. 425 [91 S.Ct. at p. 1536], italics added.) In answering the question Justice Burger, writing for the plurality, considered two factors: 1) what the statute required of a driver involved in an accident causing property damage; and 2) the degree to which those requirements presented a risk of incrimination.

In applying *Byers* it is important to be clear on what it considered. The case dealt only with the two statutory requirements as legislatively enacted: the duty to stop at the scene of an accident and the duty to provide identifying information. The plurality did not expend a syllable discussing whether the statute required the additional admission urged here.

It is also important to note that *Byers* dealt with a statute that applied to accidents involving property damage. It did not address a statute relating to

accidents causing death or injury. Indeed, in a footnote to the plurality opinion, Justice Burger observes that in injury or death cases ". . . there is a statutory use restriction [Vehicle Code sections 20012, 20013] for these compelled disclosures." (*Byers, supra,* 402 U.S. at p. 426, fn. 1 [91 S.Ct. at p. 1537].) The statutes Justice Berger cites do restrict admissibility of an officer's written reports. Because *Byers* was not a death or injury case the plurality did not pursue further whether a driver's oral statements would be admissible. (But see *People* v. *Misner* (1955) 134 Cal.App.2d 377 [285 P.2d 938].)

In part I of *Byers* the plurality considered the risk of incrimination as a factor implicating the protections of the Fifth Amendment. Justice Berger pointed out: "Whenever the Court is confronted with the question of a compelled disclosure that has an incriminating potential, the judicial scrutiny is invariably a close one. Tension between the State's demand for disclosures and the protection of the right against self-incrimination is likely to give rise to serious questions. Inevitably these must be resolved in terms of balancing the public need on the one hand, and the individual claim to constitutional protections on the other; neither interest can be treated lightly." (402 U.S. at p. 427 [91 S.Ct. at p. 1537].) The plurality then concluded that merely stopping at the scene of an accident causing property damage and identifying oneself does not entail a sufficient risk of criminal inculpation to infringe upon by the Fifth Amendment. "A name, linked with a motor vehicle, is no more incriminating than [a] tax return, linked with [a] disclosure of income [citation]. It identifies but does not by itself implicate anyone in criminal conduct." (*Id.* at pp. 433-434 [91 S.Ct. at pp. 1540-1541].)

In the second part of *Byers* the plurality concluded that the statute's requirements did not violate the Fifth Amendment because the information required by the statute was not testimonial. Justice Berger explained the plurality's view: "The act of stopping is no more testimonial—indeed less so in some respects—than requiring a person in custody to stand or walk in a police lineup, to speak prescribed words, or to give samples of handwriting, fingerprints, or blood. [Citations.] Disclosure of name and address is an essentially neutral act." (402 U.S. at pp. 431-432 [91 S.Ct. at pp. 1539-1540].)

The four-member plurality needed Justice Harlan's concurrence to resolve the case. Justice Harlan did not agree with the plurality's conclusion in part I. In Justice Harlan's view even the limited requirements at issue, even in a property damage case, created a substantial risk of inculpation. He acknowledged the holding in *United States* v. *Wade, supra,* 388 U.S. 218, that

a person could be compelled to stand in a lineup. He distinguished *Wade*, however, by noting that in such a situation the compulsion operated after the state had independently focused on a defendant. (*Byers, supra*, 402 U.S. at p. 436 [91 S.Ct. at pp. 1541-1542] (conc. opn. of Harlan J.).) In Justice Harlan's view the *Byers* requirements, even without the gloss the majority would add here, impermissibly compelled a motorist to focus the investigation on himself. (*Ibid.*)

Justice Harlan reviewed the extant Supreme Court jurisprudence and acknowledged that the cases hold the presence of a substantial risk of self-incrimination triggers Fifth Amendment protections. (*Byers, supra*, 402 U.S. at pp. 437-439 [91 S.Ct. at pp. 1542-1544] (conc. opn. of Harlan, J.).) He went on to suggest a modification of that standard. Without the concurrence of any other justice, he took the position that the presence of a substantial incriminatory risk should not be a sufficient basis, standing alone, to support a Fifth Amendment invocation. (*Id.* at p. 453 [91 S.Ct. at pp. 1550-1551] (conc. opn. of Harlan, J.).) Instead, Justice Harlan proposed a balancing test which would take into account the purpose of the regulatory statute, the necessity for self-reporting to effectuate the regulatory purpose, and the nature of the disclosures compelled. Applying his test to the *Byers* facts, Justice Harlan concluded that the Fifth Amendment did not require use immunity to justify the compelled disclosures. Again, it is important to note that no other member of the court joined Justice Harlan in his suggestion that the court retreat from its previous rulings. The rule remains; a statute compelling an admission that creates an appreciable risk of self-incrimination violates the Fifth Amendment, regardless of the statute's purpose.

The Supreme Court was very clear on what "narrow question" it was deciding. *Byers* stands for the proposition that a driver involved in an accident that causes property damage can be compelled to stop and provide identification to another driver. It did not address whether a driver could be compelled to make any disclosures to a law enforcement agent. It did not consider whether the rule would be different if death or injury were involved, rather than property damage. It decidedly did not contemplate the admission the majority imposes here.

The majority ignores the limited nature of the plurality's inquiry. They seek to expand the "central reasoning" of *Byers* beyond the circumscriptions both the plurality and concurrence carefully note. (See, maj. opn., *ante*, at p. 1550). It is a fundamental rule of precedential analysis that a case decides that which it decides. Attempts to expand a case's precedential authority beyond its facts are dangerous expeditions, particularly in the absence of the explicit pronouncement of a broader rule. The expedition proves fatal when the court takes care to affirmatively limit its holding, as is the case here.

There is an even more fundamental problem with the majority's attempt to rely on *Byers*. In arguing that "the central teaching of *California* v. *Byers* is that [the disclosure statutes do not violate the Fifth Amendment because] 'disclosures with respect to automobile accidents simply do not entail the kind of substantial risk of self-incrimination involved in [other cases]' . . . ." (maj. opn., *ante*, at p. 1553), the majority makes a crucial error. Justice Harlan, the necessary fifth vote, did not join in that conclusion. Only the four-justice plurality held that view, based on the narrow facts. Because the conclusion did not command a majority, it cannot be the "central teaching" of the case and cannot stand as precedent.[5] If *Byers* teaches anything, it instructs that the majority's conclusion is legally unsound because it was rejected by five of the nine justices.

*Byers*, *supra*, 402 U.S. 424, explicitly dealt with the language of the statute. The plurality opinion is replete with references to "the statute." Likewise, Justice Harlan's concurrence is limited in its scope. Justice Harlan discusses at length the need to balance legitimate governmental interests with the constitutional protections of the Fifth Amendment. (*Id.* at pp. 435-455 [91 S.Ct. at pp. 1541-1552] (conc. opn. of Harlan, J.).) He concludes: "[W]e must deal in degrees in this troublesome area." (*Id.* at p. 454 [91 S.Ct. at p. 1551] (conc. opn. of Harlan, J.).) He notes that courts must "take cognizance of the level of detail required in the reporting program." (*Id.* at p. 456 [91 S.Ct. at p. 1552] (conc. opn. of Harlan, J.).) He ends by saying that considering, among other factors, "the nature of the disclosures involved," he cannot conclude the Fifth Amendment requires the use restriction articulated by the California Supreme Court's opinion. (*Id.* at p. 458 [91 S.Ct. at p. 1553] (conc. opn. of Harlan, J.).)

A fair reading of the plurality opinion and the Harlan concurrence reveals the justices were aware of the delicate balance they sought to strike. A more expansive reading is not justified by the text. The majority's conclusion that the Supreme Court would have upheld a statute such as the one the majority crafts is a prognostication in which I cannot join. Worse than being merely an unsupported assertion it is definitively inconsistent with the carefully drafted and limited opinions of the plurality and Justice Harlan.[6]

---

[5]The majority's reference to Justice Harlan's conclusion that a driver who complies with the statute as written admits involvement in the accident (maj. opn., *ante*, at pp. 1552-1553), suffers from the same analytical flaw. No other justice, including those in the plurality accepted that conclusion. It was Justice Harlan's view alone, thus lacking precedential force.

[6]The majority claims to "find further support" for their conclusion in the opinions of two cases from Virginia and New York. (Maj. opn., *ante*, at p. 1551, fn. 9, *Banks* v. *Commonwealth* (1976) 217 Va. 527 [230 S.E.2d 256] and *People* v. *Samuel* (1971) 29 N.Y.2d 252 [327 N.Y.S.2d 321, 328, 277 N.E.2d 321].) Their reliance is as misplaced as their reliance on

The majority also seeks to separate part I of the *Byers* opinion, dealing with risk of incrimination, from part II, addressing the testimonial question. By this analytical device the majority seeks to avoid discussion of the concept of testimonial communications in Fifth Amendment jurisprudence. Part I of the plurality opinion does not discuss the concept in any way. This omission is not surprising because of the limited nature of the court's inquiry: whether a statute can compel a motorist to stop and provide identifying information. Because both requirements are nontestimonial part one of the opinion omits such a discussion. It is this very point that part II makes clear. A reading of the entire opinion is necessary to understand the extent, and limitation, of the high court's ruling. Further, as noted above, part one of the opinion cannot stand alone, because its reasoning did not command a majority of the court.

The testimonial nature of the majority's compelled admission and the risk of incrimination it presents are the factors which place it at odds with the Fifth Amendment. The majority seeks to avoid this conclusion by defining the issue differently. They conclude "[i]t is the context in which the disclosure is required and the underlying purpose of the disclosure" that are determinative. (Maj. opn., *ante*, at p. 1553.) The Supreme Court, however, has held that the "availability of the privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the *nature* of the statement or admission and the *exposure* which it invites." (*In re Gault* (1967) 387 U.S. 1, 49 [87 S.Ct. 1428, 1455, 18 L.Ed.2d 527], italics added.) Indeed, as noted, the concurrence by Justice Harlan in *Byers* explicitly refers to the "nature of the disclosures involved." (402 U.S. at p. 458 [91 S.Ct. at p. 1553] (conc. opn. of Harlan, J.).)

The majority interprets *Byers* to say that context and purpose are the primary focus of a Fifth Amendment analysis, rather than substance or effect. (See maj. opn., *ante*, at p. 1553.) Such a conclusion flows from a fundamental misreading of *Byers*. The *Byers* plurality directly considered whether the statutory requirements presented a risk of incrimination. That is, they first considered the *effect* of the disclosure. The plurality then analyzed whether a testimonial assertion was required. In doing so they evaluated the *substance* of the requirements. Because they decided that neither the effect nor the substance of the requirements implicated the Fifth Amendment, the *Byers* plurality was free to focus on context. Here, the majority tosses aside both substance and effect to claim that context and purpose are all. Not only do the majority put the cart before the horse, they disengage the cart and run the horse from the field.

---

*Byers.* These foreign cases both involve drivers who did not stop or provide identification as statutorily required. They did not involve judicially compelled admissions of involvement. They are inapposite.

The *Byers* court dealt with a statute designed to ensure identification would be provided, as Justice Burger phrased it, "[a] name, linked with a motor vehicle." (*Byers, supra,* 402 U.S. at pp. 433-434 [91 S.Ct. at p. 1540].) The majority's new statute changes the aim, from a statute designed to insure identification to one which facilitates an investigation. Under the majority's statute, we now achieve "a name, linked with a motor vehicle, linked with a compelled admission of involvement."

The majority defends their expansion of the statute by asserting: "The Fifth Amendment was never intended to be a refuge for those facing civil liability. It was not intended to force investigating agencies, or citizens, to invest time and energy puzzling out who was driving when injury accidents occur . . . ." (Maj. opn., *ante,* at p. 1557.) What the majority fails to acknowledge is that those who kill or injure others while driving will frequently face both civil *and* criminal liability. The "investigating agencies" to which they refer are law enforcement agencies investigating crimes.

The logical conclusion of the majority's assertion is that the Fifth Amendment must yield when to honor it would be inconvenient. To make such a point is to simultaneously refute it. The Fifth Amendment does not exist to facilitate law enforcement, it exists to protect citizens from governmental demands that they incriminate themselves. The majority does not point to another state in America that imposes an obligation such as theirs on its citizens. California should not lead this expedition. It takes us away from the hearthstone of the Fifth Amendment and into uncharted territory where the fundamental relationship between the people and their government can be altered without legislation to suit the convenience of the sovereign. This is not the arrangement the framers of the Constitution had in mind.

Appellant here has relied on *People* v. *Bammes* (1968) 265 Cal.App.2d 626 [71 Cal.Rptr. 415] (*Bammes*) for the proposition that admission of involvement is not required. The majority rejects *Bammes* by citing *Byers* v. *Justice Court, supra,* 71 Cal.2d 1039. The reliance on *Byers* v. *Justice Court* is somewhat problematic in that its judgment was vacated by the United States Supreme Court in *Byers, supra,* 402 U.S. 424.

As the majority notes, Justice Peters, in *Byers* v. *Justice Court* did observe: "First, although it is true that neither section 20001 nor section 20002 explicitly requires drivers involved in accidents to identify themselves *as* involved drivers, neither can fairly be read to require only that an involved driver identify himself as merely having been 'at or near the scene of the accident when it occurred.' " (71 Cal.2d. at p 1045, italics in original.) What the majority fails to point out is the very next sentence: "Even if these

statutes could be so read, it seems clear that *in almost all circumstances* it would be obvious to the person to whom the identification was made that the person supplying identification was a driver involved in the accident." (*Ibid.,* italics added.)

Three things then, are apparent. First, *Byers* v. *Justice Court* did *not* hold an explicit admission is required by the statute. It merely criticized *Bammes* for concluding that a driver could say something false, i.e., that he was merely at or near the scene, rather than the driver. Second, *Byers* v. *Justice Court* assumed the usual circumstance in which involvement is "obvious," rather than the unusual circumstance we deal with here, in which involvement is not apparent. Third, the majority cannot have it both ways. They cannot fairly cite *Byers* v. *Justice Court* to support their interpretation of the statute without acknowledging that the case also concluded that their interpretation required the extension of immunity because it otherwise violated the Fifth Amendment. "We are satisfied that the privilege is applicable when a driver of a motor vehicle involved in an accident is confronted with a statutory requirement to stop and divulge his identity and reasonably believes that compliance with the statute will result in self-incrimination." (71 Cal.2d at p. 1047.)

The majority's further reliance on *Baltimore Dept. of Social Servs.* v. *Bouknight* (1990) 493 U.S. 549 [110 S.Ct. 900, 107 L.Ed.2d 992], is also unavailing. In *Bouknight,* Justice O'Connor concluded that a mother could not resist a court order to turn her young son over to child welfare authorities by relying on the Fifth Amendment. The analysis was based, however, on the fact that Ms. Bouknight had accepted a return of the child to her custody subject to a number of conditions to which she had agreed after the court had lawfully extended jurisdiction over the youngster. By resuming custody under conditions, she agreed to relinquish custody if the conditions were not met. She could not assert the privilege to avoid an agreement she had made. The *Bouknight* court went on to state that the "testimonial aspects" that might be involved in Bouknight's production of the child, might well require a limitation on the use of those testimonial aspects in a subsequent criminal proceeding. (*Id.* at pp. 561-562 [110 S.Ct. at pp. 908-909].) This is the kind of limitation articulated by our Supreme Court in *Byers* v. *Justice Court, supra,* 71 Cal.2d 1039 and which the majority agrees they might deem necessary were they writing on a clean slate. (Maj. opn., *ante,* at p. 1554.)

The majority asserts: "Similarly [to the court in *Bouknight*] we are not called upon to define the precise limitations on the state's ability to *use* the 'testimonial' aspect of the required disclosures." (Maj. opn., *ante,* at p. 1554). In fact the majority is called upon to address the use question. If their

interpretation of the statute is to stand they must decide whether it violates the Fifth Amendment or requires the use immunity extended in *Byers* v. *Justice Court*, and suggested by *Bouknight*. The procedural posture of *Bouknight* allowed the court to defer this later consideration in a way that our case does not permit. All *Bouknight* resolved was that Ms. Bouknight had to release her son to authorities to protect his safety. If there was a future prosecution, the issue of immunity could be dealt with. Our case is different. Here, the majority seeks to punish the defendant for a completed course of conduct. There is no opportunity to extend immunity to him. He will be punished for not anticipating the majority's statutory amendment regardless of the incriminating risk. The extension of immunity to some future litigant will be of cold comfort to him.[7] My learned colleagues rely on what they conclude is the law announced in *Byers*. They simply read *Byers* too broadly and extend its holding to encompass matters which both the plurality and Justice Harlan clearly exclude from the sweep of their ruling.

## Conclusion

We cannot lose sight of the fact that we are dealing with a constitutional protection. Even well-intentioned limitations on such an essential guarantee are to be closely scrutinized. As Justice Bradley observed in *Boyd* v. *United States, supra*, 116 U.S. 616: "It may be that it is [a limitation] in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. . . . It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." (*Id.* at p. 635 [6 S.Ct. at p. 535].) This view was echoed by Justice Brandeis, dissenting in *Olmstead* v. *United States* (1928) 277 U.S. 438 [48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376]: "The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." (*Id.* at p. 479 [48 S.Ct. at p. 573] (dis. opn. of Brandeis, J.).)

Likewise, Justice Harlan noted the same danger in his *Byers* concurrence. "If the technique of self-reporting as a means of achieving regulatory goals unrelated to deterrence of antisocial behavior through criminal sanctions is carried to an extreme, the 'accusatorial' system which the Fifth Amendment is supposed to secure can be reduced to mere ritual. And the risk that such a situation will materialize is not merely a function of the willingness of an

---

[7]The majority says that defendant waived the privilege when he disclosed on November 3 that he had been the driver. (Maj. opn., *ante*, at p. 1557, fn. 13.) That conduct, however, was not the basis for his prosecution. He was prosecuted for his conduct a month earlier. The waiver analysis is inapplicable.

ill-disposed officialdom to exploit the protective screen of ostensible legislative purpose to bypass the procedural limitations on governmental collection of information in the criminal process. The sweep of modern governmental regulation—and the dynamic growth of techniques for gathering and using information culled from individuals by force of criminal sanctions—could of course be thought to present a significant threat to the values considered to underpin the Fifth Amendment, quite apart from any supposed illegitimate motives that might not be cognizable under ordinary canons of judicial review." (402 U.S. at pp. 453-454 [91 S.Ct. at pp. 1550-1551] (conc. opn. of Harlan, J.).)

By reaching out to impose an obligation not adopted by the Legislature, the majority commits three errors. First, they judicially legislate criminal conduct, which we are not empowered to do. Second, they judicially enact a statute which violates the Fifth Amendment of the United States Constitution and article I, section 15 of the California Constitution.[8] Third, they create a substantial anomaly in the law. Under the majority's statute, if a man drives recklessly and accidentally kills another, he must confess his involvement. If the same man brandishes a gun and recklessly kills another, he may remain silent.

Commission of these errors is neither necessary nor constitutionally permissible. I would reverse the felony conviction. I would affirm the misdemeanor conviction and join in the majority's analysis of the remaining issues.

Appellant's petition for review by the Supreme Court was denied July 15, 1999. Mosk, J., was of the opinion that the petition should be granted.

---

[8]"Persons may not . . . be compelled in a criminal cause to be a witness against themselves. . . ."